ALLSTATE INSURANCE COMPANY,
Plaintiff and Respondent,

v.

Louise IVIE and Travelers Insurance
Companies, Defendant and
Appellant.

No. 15983.

Supreme Court of Utah.

Feb. 7, 1980.

L. Rich Humpherys of Christensen, Gardiner, Jensen & Evans, Salt Lake City, for defendant and appellant.

L. E. Midgley, Salt Lake City, for plaintiff and respondent.

MAUGHAN, Justice:

Before us is a matter involving our "no-fault" insurance act. It was resolved, by summary judgment, in favor of plaintiff Allstate Insurance Company. We reverse and remand. Costs awarded to defendant Ivie.

Defendant, hereinafter "Ivie," sustained severe personal injuries in a motor vehicle accident. Allstate Insurance Company, the plaintiff herein, was the "no-fault" insurance carrier for the vehicle in which Ivie was a passenger. In compliance with the Utah Automobile No-Fault Insurance Act, Section 41, Title 31, U.C.A.1953, as enacted 1973, Allstate paid Ivie PIP (personal injury protection) benefits amounting to the sum

of $7,394.00. Thereafter, Ivie filed an action for damages against James Salisbury, the driver of the other motor vehicle involved in the accident. Salisbury's liability insurer was Travelers Insurance Company. Allstate declined to join in or participate in the lawsuit, although it asserted it had subrogation rights to the extent of the PIP benefits it had paid.

The trial of the negligence action was set for April 11, 1978. In March 1978, Travelers offered to settle for $44,000. Travelers' liability was limited to $50,000 under the policy. Ivie's counsel was employed under a contingency fee arrangement, viz., twenty-five percent prior to actual trial preparation and one third if the case were settled immediately before or during the trial, or went to judgment. Additionally, Ivie was responsible for all costs and expenses incurred in the prosecution of her claim. After reviewing the deposition of tort-feasor Salisbury, and further investigation, Ivie determined there would be a limited opportunity to collect a judgment in excess of the liability policy limit of $50,000, although Ivie claimed $150,000 in damages. Under these circumstances, Ivie accepted a settlement of $44,000; thus she limited her attorney's fees to twenty-five percent. Travelers issued two drafts: one was made payable jointly to Allstate and Ivie in the sum of $7,394.00; the other was for the balance of the $44,000 settlement. Ivie refused to deliver the check for $7,394.00 to Allstate, and the present action was filed.

In its complaint, Allstate pleaded in the alternative that it was entitled to subrogation under the contractual terms of the policy issued on the vehicle in which Ivie was a passenger to the extent it had paid the PIP benefits, or it was entitled to reimbursement under Section 31–41–11, U.C.A. 1953, enacted in 1973. Allstate further pleaded for a declaration of its rights in regard to Ivie's recovery as a result of the settlement of her tort action. Allstate moved for summary judgment.

Ivie opposed the summary judgment on the ground there were triable issues of fact. Ivie urged equitable principles apply to sub-

rogation, and the insured is entitled to be made whole before the insurer is entitled to any portion of the recovery from the tortfeasor. Ivie argued she sustained severe injuries and was compelled to settle for a sum totally inadequate to compensate her for the total damages sustained. According to her argument, to prevail Allstate must prove it has a greater equity than Ivie, which, in effect, would require proof Ivie had received double payment for her medical expenses.[1]

Ivie further urged, if Allstate were entitled to its subrogation claim, it should contribute to the costs and attorney's fees incurred by Ivie in collecting the claim. Ivie cites the principle that in the absence of an agreement to the contrary as set forth by the terms in a policy of insurance, the insured, who is successful in the recovery of funds which include money payable by the insured to an insurance company, is entitled to deduct attorney fees and other expenses reasonably and necessarily incurred in making such a recovery from the amount payable to the insurance company.[2]

The trial court granted Allstate's motion for summary judgment. Specifically, the court granted Allstate judgment against Ivie and Travelers jointly and severally in the sum of $7,394.00. The court declared Travelers was bound by the provisions of Section 31–41–11, and Ivie was not entitled to an attorney's fee from Allstate.

To resolve the issues between the parties, it is essential to construe Section 31–41–11; however, this section cannot be construed in isolation, but must be correlated with other pertinent provisions in Chapter 41 of Title 31, Utah Automobile No-Fault Insurance Act. As an aid to the proper construction of this act, reference to an article by Robert E. Keeton in the 1973 Utah Law Review is beneficial, *Compensation Systems and Utah's No-Fault Statute*, 1973 ULR 383. Therein, it is explained that twenty-one states have enacted "no-fault" legislation.

These laws are of two types: first, the add-on statutes; and second, the partial tort exemption statutes. The add-on statutes merely add to the negligence system of reparations with some kind of no-fault benefits to an injured person, without regard to fault. All tort claims are preserved under these statutes, although some provide for subrogation or offset to avoid double recovery for an item of loss. These add-on laws are not regarded as true "no-fault" legislation.

The true "no-fault" insurance is a type of compensation system which couples the payment of benefits on a no-fault basis with the partial elimination of fault-based tort actions for both economic losses and pain and suffering. This system generally continues to permit fault-based claims for pain and suffering in the more serious cases and for economic losses above no-fault benefits. A system which has no tort exemption at all is not a "no-fault" insurance. The Utah no-fault statute is a compulsory, partial tort exemption law coupling no-fault insurance benefits, Section 6, with a partial elimination of tort claims for bodily injury.

Section 2 of the act provides:

The purpose of this act is to require the payment of certain prescribed benefits in respect to motor vehicle accidents through either insurance or other approved security, but on the basis of no fault, preserving, however, the right of an injured person to pursue the customary tort claims where the most serious type of injuries occur . . .

(1) No person for whom direct benefit coverage is provided for in this act shall be allowed to maintain a cause of action for general damages arising out of personal injuries alleged to have been caused by an automobile accident except where there has been caused by this accident any one or more of the following:

---

1. *Transamerica Insurance Company v. Barnes*, 29 Utah 2d 101, 505 P.2d 783 (1972); *Lyon v. Hartford Accident and Indemnity Company*, 25 Utah 2d 311, 480 P.2d 739 (1971).

2. *State Farm Mutual Automobile Insurance Company v. Clinton*, 267 Or. 653, 518 P.2d 645 (1974).

(a) Death;

(b) Dismemberment or fracture;

(c) Permanent disability;

(d) Permanent disfigurement; or

(e) Medical expenses to a person in excess of $500.

(2) The *owner* of a motor vehicle with respect to which security is required by this act *who* fails to have such security in effect at the time of an accident *shall have no immunity from tort liability* and *shall be personally liable for the payment of the benefits provided for under Section 31–41–6.* [Emphasis supplied].

■ Under this statutory plan, first party PIP benefits up to the amounts provided in Section 6 are paid to an injured person without regard to fault. Furthermore, the injured party is precluded from maintaining an action to recover general damages (all damages other than those awarded for economic losses),[3] except where the threshold requirements of Section 9(1) are met. Under Section 9(2), there are two consequences to the owner of a motor vehicle who fails to have the security required by Section 5: first, he has no immunity from tort liability; second, he is *personally liable* for the benefits provided under Section 6. The only logical inference is that if a party has the security required under Section 5, the no-fault insurance act confers two privileges: first, he is granted partial tort immunity; second, he is not personally liable for the benefits provided under Section 6. He does, however, remain liable for customary tort claims, viz., general damages and economic losses not compensated by the benefits paid under Section 6, where the threshold provisions of Section 9(1) are met.

■ There is no provision in the statutory scheme to indicate the tort-feasor who has complied with the security provisions of the act, becomes personally liable for the PIP benefits provided in Section 6, when the injured party is entitled under the threshold provisions of Section 9(1) to maintain a claim for personal injuries. In such a situation, the injured party should plead only for those damages for which he has not received reparation under his first party insurance benefits. In order to present a completely factual picture to the jury, the injured party may wish to present evidence of all his medical bills or other economic losses. The court, by an appropriate instruction, could explain to the jury that these economic losses have not been included in the prayer for damages, because the injured party has previously received reparation under his own no-fault insurance coverage.

The foregoing interpretation is the only one consistent with the provisions in Section 9(2). The obvious legislative intent was to encourage compliance with the security provisions of the act. The design to compel compliance included not only partial tort exemption, but immunity from *personal liability* for payment of the benefits provided for under Section 6.

When Section 9(2) is construed in conjunction with Section 9(1), the legislative intent emerges.

No person for whom direct benefit coverage is provided for in this act shall be allowed to maintain a cause of action for general damages . . . except where . . .

Until the threshold requirements are met, the injured party is limited to his direct benefit coverage. If his injuries meet the threshold requirements, then he may maintain a claim for *general damages.* The term "general damages" is explained as follows:

Another interesting feature of the Utah law is its distinctive phrasing of the tort exemption provision, which declares: "No person for whom direct benefit coverage is provided for in this act shall be allowed to maintain a cause of action for general damages unless one of the threshold requirements is met." The term "general damages" is not defined in the statute. The tort exemption provisions of other statutes, rather than referring to

3. 1973 ULR 383, 392.

"general damages" have used phrases such as "pain and suffering" or "pain, suffering, mental anguish, and inconvenience," or have used especially defined term such as noneconomic detriment. The term "general damages" was often used, in public discussion of no-fault proposals, as a comprehensive term for elements of tort damages other than economic losses, which were often referred to as "specials." In view of that usage, it would seem that "general damages" as used in the Utah statute includes damages for pain and suffering. It may reasonably be argued that "general damages" refers more broadly to all damages other than those awarded for economic losses and that preclusion of "general damages" precludes also any award for disability as such (including for example, disability to play golf), as distinguished from an award reimbursing economic losses resulting from the disability.[4]

■ Thus, under Section 9(1) and (2), the tort-feasor has partial immunity for general damages until the threshold provisions are met and no personal liability for the payment of the benefits provided under Section 6, if he has complied with the security requirements of the act.

Section 11 must be construed in connection with the other relevant provisions. Section 31–41–11 provides:

(1) Every insurer authorized to write the insurance required by this act shall agree as a condition to being allowed to continue to write insurance in the State of Utah;

(a) That where its insured is or would be legally liable for the personal injuries sustained by any person to whom benefits required under this act have been paid by another insurer, including the state insurance fund, it will reimburse such other insurer for the payment of such benefits, but not in excess of the amount of damages so recoverable, and

(b) That the issue of liability for such reimbursement and the amount of same shall be decided by mandatory, binding arbitration between the insurers.

Section 11 is not a model of clarity. A degree of confusion has been generated by the subtitle to this section supplied by the publisher of the Utah Code Annotated, The Allen Smith Company. The subtitle reads: "Subrogation rights and arbitration between insurers." In contrast, the subtitle in the session laws, Laws of Utah, 1973, Regular Session, Chapter 55, reads: "Conditions insurers to abide by."

In reference to Section 11, Keeton states:[5]

The Utah law preserves subrogation-like rights of reimbursement among no-fault insurers. That is, after an insurer pays no-fault benefits, it is entitled to reimbursement from the insurer of a negligent driver who would have been liable in tort to the injured person but for the partial tort exemption. These claims for reimbursement are declared to be subject to mandatory, binding arbitration between the insurers. This would appear to be an undesirable preservation of fault based claims among insurers. It may happen, however, that the provision will fall into disuse in practice. For example, two insurers with a large volume of claims against each other may agree to square accounts periodically on an actuarial basis, or even to forego these reimbursement claims against each other altogether, because it would be cheaper for both to do so.

The state of Oregon has a provision similar to Section 11, viz., ORS 743.825. It should be emphasized that Oregon has an add-on statute with no partial tort exemption.[6] Oregon further requires the injured person to include in his claim or legal action the benefits furnished by the insurer, ORS 743.828(3)(b). By a separate statute, there is a provision in Oregon for subrogation. ORS 743.830 provides:

4. Id. p. 392.

5. Id. at pp. 392–393.

6. Id. p. 386.

If a motor vehicle liability insurer has furnished personal injury protection benefits . . .

(1) The insurer is entitled to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of the injured person against any person legally responsible for the accident, to the extent of such benefits furnished by the insurer less the insurer's share of expenses, costs and attorney fees incurred by the injured person in connection with such recovery.

(2) The injured person shall hold in trust for the benefit of the insurer all such rights of recovery which he has, but only to the extent of such benefits furnished.

(3) The injured person shall do whatever is proper to secure, and shall do nothing after loss to prejudice, such rights.

(4) If requested in writing by the insurer, the injured person shall take, through any representative not in conflict in interest with him designated by the insurer, such action as may be necessary or appropriate to recover such benefits furnished as damages from such responsible person, such action to be taken in the name of the injured person, but only to the extent of the benefits furnished by the insurer. In the event of a recovery, the insurer shall also be reimbursed out of such recovery for the injured person's share of expenses, costs and attorney fees incurred by the insurer in connection with the recovery.

(5) In calculating respective shares of expenses, costs and attorney fees under this section, the basis of allocation shall be the respective proportions borne to the total recovery by:

(a) Such benefits furnished by the insurer; and

(b) The total recovery less (a).

(6) The injured person shall execute and deliver to the insurer such instruments and papers as may be appropriate to secure the rights and obligations of the insurer and him as established by this section.

(7) Any provisions in a motor vehicle liability insurance policy or health insurance policy giving rights to the insurer relating to subrogation or the subject matter of this section shall be construed and applied in accordance with the provisions of this section.

■ This latter section would be a redundancy if Section 743.825 of the Oregon code provided for subrogation by the no-fault insurer to its insured, when such insured received a settlement or judgment for personal injuries. Similarly, Section 11 in the Utah No-Fault Insurance Act cannot be interpreted as conferring on the no-fault insurer a right of subrogation to the funds received by its insured for personal injuries. Section 11 grants the no-fault insurer a limited, equitable right to seek reimbursement in arbitration proceeding against the liability insurer. Section 11 cannot be deemed as conferring subrogation rights on the no-fault insurer, vis-a-vis its insured as to his recovery in a settlement or legal action.

■ The nature and purpose of subrogation should be reviewed. Subrogation is a creature of equity, its purpose is to work out an equitable adjustment between the parties by securing the ultimate discharge of a debt by the person who, in equity and in good conscience, ought to pay it. Subrogation has a dual basis—". . . when the insurer has made payment for the loss caused by a third party, it is only equitable and just that the insurer should be reimbursed for his payment to the insured, because otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the third party, or in the absence of such double recovery by the insured, the third party would go free notwithstanding the fact that he has a legal obligation in connection with the damage.[7] "

■ Under the Utah No-Fault Insurance Act, the tort-feasor who has the required security, is not personally liable to the in-

7. 16 Couch on Insurance 2d, Sec. 61.18, pp. 248–249.

jured person for payment of Section 6 benefits, Section 9(2); therefore, the tort-feasor has no personal legal obligation to reimburse the injured party's insurer. On the other hand, the tort-feasor's liability insurer, in fulfilling its duty to respond to the claims of the injured party to the limits of its policy, stands in the shoes of its insured and pays on the basis of its insured's personal liability to the tort victim; this personal liability does not include PIP payments. Thus, the tort victim's recovery from the liability insurer cannot be reduced by the PIP payments. If the victim's recovery be reduced by the amount of the PIP payments by granting his no-fault insurer a right of subrogation, it is the no-fault insurer who receives double recovery. This is so because the insurer receives a premium for the benefits, and then receives full reimbursement, while the liability insurance available to recompense the victim is depleted by payments for which the liability insurer is not responsible to the victim.

In the instant action, Allstate has no right of subrogation to the recovery of Ivie, and the trial court erred in its ruling. The cause is remanded with an order to enter judgment in favor of Ivie in the amount of $7,394.00, the sum representing the PIP payments. However, Allstate is not precluded from claiming reimbursement from Travelers in an arbitration proceeding.

WILKINS, J., concurs.

STEWART, Justice (concurring):

I concur in the opinion of Justice Maughan and add the following comments in explanation of my position.

The Utah Automobile No-Fault Insurance Act, § 31–41–1, et seq., U.C.A. (1953), as amended, is neither clear nor specific with respect to the relative rights of a no-fault insurer in an insured's recovery from a third-party tortfeasor. Accordingly, it is our obligation to construe the Act to effectuate the purposes set out in § 31–41–2. That provision, in part, provides:

> The intention of the legislature is hereby to possibly stabilize, if not effectuate certain savings in, the rising costs of automobile accident insurance and to effectuate a more efficient, equitable method of handling the greater bulk of the personal injury claims that arise out of automobile accidents, these being those not involving great amounts of damages.

Contrary to the view of the dissenting opinion in this case, the result reached by a majority of the Court will not result in double recovery to an injured person. It will, on the other hand, result in greater efficiency, accuracy and fairness in determining the relative rights of the interested parties. Also, it will have the beneficial effect of reducing the possibilities for controversy and litigation between no-fault insurers and their insureds.

Pursuant to the majority opinion, a no-fault insured in an action against a tortfeasor may not recover from the tortfeasor any sums already paid by the no-fault insurer. Thus, double recovery by an insured is in fact barred. The no-fault insurer, by being subrogated to the rights of the insured as provided by § 31–41–11, has a right to collect directly from the tortfeasor's insurer (whether or not the insured party has filed a tort claim) by way of arbitration pursuant to § 31–41–11. If the injured party files an action against the third-party tortfeasor which results in a judgment for the insured, the judgment would be given dispositive effect on the issue of fault and the relative liabilities of the insurance companies in the arbitration proceedings, for it is in the arbitration proceedings that the no-fault insurer is subrogated to the rights of the insured. Because the insurance company stands in privity with its insured, principles of res judicata and collateral estoppel dictate as much. In cases which do not go to judgment because of a settlement, the no-fault insurer and the tortfeasor's insurer may be able to use the settlement agreement and amount as a guide in settling liability for the no-fault payments. If no voluntary settlement is recorded, the arbitration apparatus may be used to settle the dispute. No doubt the insurance companies will be able in most

cases to settle the accounts between themselves without resort to formal proceedings. This procedure comports with the language and intent of § 31–41–11.

On the other hand, a construction of the Act which subrogates the insurer to the rights of the insured in a judicial proceeding would render meaningless the arbitration provisions of the Act, lead to insuperable practical difficulties in making an equitable allocation between the insurance company and its insured, and increased litigation and its attendant costs.

In *Transamerica Insurance Co. v. Barnes*, 29 Utah 2d 101, 505 P.2d 783 (1972), this Court held that an insurer's claim under a right of subrogation to a portion of the proceeds from a settlement made by the insured with a third-party tortfeasor was a matter which had to be proved on a record with evidence showing that the item of damage sought to be recovered was in fact included in the settlement sum. The court stated that the insurer must:

> . . . present proof which establishes that the damages covered by defendant's settlement were the same or cover those for which defendant has already received indemnity from [insurer]; otherwise, the receipt of payment from the tort-feasor does not entitle the [insurer] to the return of the payments made by it. [29 Utah 2d at 106–07, 505 P.2d at 787.]

If the no-fault insurer were accorded a right of subrogation in amounts recovered in its insured's tort action against a third-party tortfeasor, insuperable problems would arise. The most conspicuous problem would arise with respect to the settlements of an action by an insured against the tortfeasor and the allocation of the settlement among the insured and his no-fault insurer. Settlements are almost always compromises, and they are often negotiated on a lump-sum basis without particular damage items being dealt with individually. Reference to particular damage items may not be made in the course of settlement discussions, and if each particular damage item is discussed, the value, if any, accorded a particular damage item in the ultimate sum

reached is often unascertainable. The problem is even more difficult when dealing with a general verdict because it is impossible to determine what damage factors are included in a general verdict. Because of the failure to segregate and identify damage items, subrogation may not be an effective remedy to prevent double recovery on the one hand, and to insure the victim the full value of his lawsuit on the other.

These difficulties are avoided if the personal injury protection payments made to the insured are not a recoverable damage item in an action by the insured against the tortfeasor—whether the action results in a settlement or a judgment.

The interpretation of the Act adopted by a majority of the Court has the further merit of avoiding serious problems with respect to legal representation of the insured and the insurance company. If the same counsel represents both parties in settlement negotiations, conflicts of interest may well arise in determining, for example, whether or not to settle a lawsuit or to press for a larger recovery by way of a jury verdict and, of course, run the risk of no recovery at all. On the other hand, if both the insurance company and the insured are to be represented by independent counsel in pressing the claim against the third-party tortfeasor, conflict in many cases is likely.

In sum, the most effective and least costly way of dealing with the relative rights of the insured and the no-fault insurer in a recovery from a third party is to require each party to pursue its own remedy. The insured may sue for all damages less the amount paid by the no-fault insurer. The no-fault insurer has a right to protect its interests in an arbitration proceeding if that be necessary. To prevent double recovery, the no-fault amounts are not recoverable by the victim either in a settlement or in a litigated judgment. This approach will have the effect of reducing litigation, attorney's fees, and the cost of automobile accident insurance.

HALL, Justice (dissenting):

There is nothing about this case that warrants a departure from long-established

principles of subrogation. In adopting a contrary view, the majority not only ignores the language of the Utah Automobile No-Fault Act[1] which specifically preserves subrogation rights, but also ignores the recent unanimous ruling of this Court in *Jones v. Transamerica Insurance Co.,*[2] wherein we specifically recognized that the Act[3] preserved subrogation rights between insurers whenever no-fault benefits are paid.

The pure and simple facts of this case are wholly supportive of the summary judgment appealed from. Ivie chose to compromise her claim against the tortfeasor by accepting the sum of $44,000 in full settlement thereof. Prior to the settlement, Travelers duly advised Ivie of its intention to include Allstate on its settlement draft and thereby satisfy its statutory obligation to reimburse Allstate for its advance of $7,394 in PIP payments. Indeed, at the time of settlement, it issued a separate draft for the exact sum of said PIP payments ($7,394), payable jointly to Ivie and Allstate.

Travelers is not a party to this appeal and Ivie makes no further claim against it, conceding that the only matter in dispute is her entitlement to the said $7,394. Hence, for this Court to award said sum to her and then to cavalierly suggest that Travelers is obligated to pay over an additional sum of $7,394 to Allstate by way of reimbursement, constitutes a grave injustice. Such a result was not sought, nor even contemplated, by the parties, least of all by Travelers, which is not present to defend its interests.

Notwithstanding the assertion of the majority to the contrary, the net effect of its holding is to afford Ivie a double recovery of PIP payments at the unbargained for expense of Travelers. In addition, it deprives Travelers of the benefit of its bargain struck with Ivie and increases its obligation from $44,000 to $51,394, by judicial fiat.

I have no particular apprehension as to the application of the new rule of law to *future* cases since its practical, dollars and cents effect would appear to be no different than if the doctrine of subrogation were adhered to. In a judicial proceeding, the court will simply no longer make an award for damages already compensated by PIP payments, and, similarly, in negotiating a settlement of a lawsuit, an insurer will no doubt "short" his settlement offer by a sum adequate to cover its reimbursement obligation for PIP payments advanced by the insurer of the injured party.

On the other hand, applying the new rule of law in the *present* case causes me considerable concern for it effects a highly unjust and harsh result. The majority would be better advised to abide by the so-called "Sunburst Doctrine"[4] and thereby make the change in the law *prospective* only.

CROCKETT, Chief Justice (supplemental dissent):

I join in Justice Hall's dissent and would affirm the decision of the trial court.

The main objective of insurance is to provide a fair and honest recoupment of losses suffered, and not to provide a basis for parlaying the loss into a double recovery for all or part of the damages thus suffered.

The purpose of the No-Fault Insurance Act is to effectuate a more efficient method of handling minor claims arising from automobile accidents which do not involve great amounts of damages; and to provide a means for the prompt payment of certain minimal losses without regard to fault and thus without litigation, in order to effectuate certain savings in the rising costs of automobile accident insurance.[1] It should be realized that if the double recovery per-

---

1. U.C.A., 1953, 31–41–1, et seq.

2. Utah, 592 P.2d 609 (1979).

3. U.C.A., 1953, 31–41–11.

4. Laid down in the case of *Great Northern Ry. Co. v. Sunburst Oil Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360, cited in *Rubalcava v. Gisseman,* 14 Utah 2d 344, 384 P.2d 389.

1. See statements in Sec. 31–41–2, U.C.A.1953.

mitted by the main opinion is allowed, it could not do other than increase, rather than decrease, the total costs of insurance.

It requires little reflection to see that the majority decision results in an injustice to defendant Travelers. In treating a similar situation in the case of *Transamerica Ins. Co. v. Barnes,*[2] this Court stated that "If the settlement were intended to include plaintiff's prior medical expenses, two drafts should have been issued, one to plaintiff and defendant jointly and one to defendant alone."[3] That is the exact procedure followed by Travelers in this instance. It cannot fairly be questioned that the negotiations between Mrs. Ivie and Travelers were made in awareness that Travelers was obligated to reimburse Allstate for the $7,394 PIP payments which Mrs. Ivie had already received; nor that she agreed to accept $44,000 from Travelers to discharge its total liability. This is confirmed by two facts: first, Travelers' policy limit was $50,000; and it would make no sense to agree to pay $44,000, plus the obligation to reimburse Allstate for the $7,394 PIP payments, which would thus exceed Travelers' policy limits. Second, by the fact that Travelers issued the two separate drafts, one for the $7,394 payable to Allstate and Mrs. Ivie and the other for $36,606 to Mrs. Ivie, just as this Court directed in the *Barnes* case, supra.

Under the facts as they appear in this case, it is discordant to my ideas of law and justice to require Travelers to pay the $44,000 to satisfy the claims of Mrs. Ivie and of Allstate, then also be required to pay the $7,394 to Allstate to reimburse it for that portion Allstate had already paid of Mrs. Ivie's damages. That plainly and simply results in injustice: it increases Travelers' obligation by $7,394 more than it agreed to pay; and it allows Mrs. Ivie double recovery by awarding her that much more than she had agreed to accept.

There would seem to be no problem with the proposition espoused in the main opinion if the facts had been different. If the parties had negotiated their settlement with an understanding that Travelers was to reimburse Allstate for the PIP benefits it had paid, and that any settlement arrived at was in addition thereto, *no unfairness or injustice would result.* But that does not appear to be the facts here. If such an understanding is to be the condition of negotiations, it should be so understood by the parties, and effective on only a prospective basis by applying the "Sunburst Doctrine," referred to by Justice Hall.

HALL, J., also concurs in the supplemental dissent of CROCKETT, C. J.

**2.** 29 Utah 2d 101, 505 P.2d 783 (1972).

