Carrielee and Steven WILDE,
Plaintiffs and Appellants,

v.

MID–CENTURY INSURANCE COMPA-NY, Defendant and Respondent.

MID–CENTURY INSURANCE COMPA-NY, Third-Party Plaintiff and Respondent,

v.

NATIONWIDE INSURANCE COMPA-NY, Third-Party Defendant and Respondent.

No. 16916.

Supreme Court of Utah.

Aug. 28, 1981.

Robert B. Sykes, Salt Lake City, for plaintiffs and appellants.

A. Alma Nelson, Raymond M. Berry, Salt Lake City, for defendant and respondent.

STEWART, Justice:

Subsequent to receiving benefits from their no-fault insurer and obtaining a judgment against a third-party tortfeasor, plaintiffs brought this action against their no-fault insurer seeking additional no-fault insurance benefits in the amount of $6,543.50. The district court granted summary judgment in favor of the defendant insurer and dismissed plaintiffs' action. Plaintiffs appeal that dismissal.

Carrielee Wilde was insured under her husband's no-fault automobile insurance policy by Mid-Century. On March 24, 1978, she was injured in an automobile accident. Mid-Century paid her no-fault insurance benefits totaling $3,587.98, apportioned as follows: $889.48 for medical expenses; $1,402.50 for loss of wages; and $1,296 for loss of services. In an action against the tortfeasor—in essence against the liability insurer Nationwide Insurance Co.—for all damages incurred as a result of the accident, Carrielee was awarded $3,989 apportioned as follows: medical expenses $989; lost wages $2,000; lost future income benefits $–0–; and general damages $1,000. From the $3,989 judgment the court subtracted $3,587.98 received by plaintiff pursuant to her no-fault insurance contract. The money deducted was used to reimburse fully the no-fault insurer. Nationwide tendered plaintiff a check for the remaining amount of $401.02, plus interest. Plaintiff refused the tender.

Plaintiffs then brought the instant action against Mid-Century for payment of no-fault benefits pursuant to §§ 31–41–1 et seq., Utah Code Ann. (1953), as amended, claiming entitlement to benefits under the Act for which Carrielee had not been fully compensated, either by the prior no-fault payments or the judgment against the tortfeasor. Plaintiffs contend that they are now entitled to recover the maximum allowable no-fault benefits from their no-fault insurer notwithstanding the prior judgment awarding Carrielee damages for personal injuries against a third-party tortfeasor. Specifically, plaintiffs seek in this suit to recover full benefits for loss of wages and household services.

■ Plaintiffs also contend that Mid-Century, plaintiffs' no-fault insurer, was not entitled to subrogation rights in their recovery from the tortfeasor. However, we do not address this issue because it is not properly before the Court. The issue arose as a result of the trial court's judgment in the action against the tortfeasor. That judgment was not appealed and may not be

attacked here.[1] We are therefore left this issue: are plaintiffs entitled to recover additional no-fault insurance benefits after having obtained a judgment against the tortfeasor?

Defendant contends that *Jones v. Trans-America Insurance Company*, Utah, 592 P.2d 609 (1979), is dispositive of this case. In *Jones* an injured party accepted some no-fault benefits from his own insurer and later entered into a settlement agreement which released the tortfeasor from all further claims based on personal injury and property damage. The opinion does not indicate whether household expenses were included in the settlement figure, but seems to assume as much. The injured person then sued his no-fault carrier for additional damages. This Court held that the action could not be maintained because in accepting the recovery from the tortfeasor, the plaintiff did so in lieu of any additional benefits to which he may have been entitled. A central concern was that the no-fault carrier's right of subrogation was terminated by the settlement agreement. But compare *Allstate Insurance Company v. Ivie*, Utah, 606 P.2d 1197 (1980).

*Jones* does not control the questions here. Plaintiffs here did not give up all additional insurance benefits as a result of the judgment against the tortfeasor, as was the case in *Jones*.

The doctrine of collateral estoppel governs the resolution of the issues in this case. The purpose of that doctrine is to prevent the relitigation of issues which a party has once actually litigated. As the doctrine was originally formulated, it required that the parties be the same in the first and the second litigation. Mutuality of parties is no longer essential, however. This jurisdiction, following the landmark decision in *Bernhard v. Bank of America Nat'l Trust & Savings Assoc.*, 19 Cal.2d 807, 122 P.2d 892 (1942), dispensed with mutuality in collateral estoppel cases. *Searle Bros. v. Searle*, Utah, 588 P.2d 689 (1978).

Accordingly, Mid-Century, even though it was not a party to the first action, may invoke the doctrine of collateral estoppel against plaintiffs, provided that the other requirements are met.

 To invoke the doctrine, it must be demonstrated (1) that the issue decided in the previous action was identical to that tried in the subsequent action; (2) that the issue was decided in a final judgment on the merits; and (3) that the issue in the first case was competently, fully, and fairly litigated by the party against whom the doctrine is invoked. *Searle Bros. v. Searle*, Utah, *supra*, at 691. See also *Teitelbaum Furs, Inc. v. Dominion Ins. Co.*, 58 Cal.2d 601, 25 Cal.Rptr. 559, 375 P.2d 439 (1962). If these conditions are met, the party against whom the original judgment was rendered is bound, and so are those in privity with that party.

 In the instant case, Mid-Century asserts collateral estoppel as a defense against plaintiffs based on the judgment rendered in the earlier action against the tortfeasor. In that action, plaintiffs had the opportunity to prove the full extent of their damages. Although they obtained a judgment against the tortfeasor, so that it cannot, in one sense, be said to be *against* the plaintiffs, that judgment was, for practical purposes, against them because their claim is that the judgment was too low and did not adequately compensate them. Therefore, we hold (1) that the earlier judgment was against the plaintiffs, even though the judgment made an award of money to them, and (2) that, as to the issues actually litigated, the prior judgment is binding.

We next determine whether the issues actually litigated in the first action are precisely the same as those raised in the instant action. The suit against the tortfeasor was brought after the one-year period for which no-fault benefits are payable under the Act. Section 31–41–6. The No-Fault Act requires the payment of certain

---

1. For the procedure outlined by this Court to handle such problems, see *Allstate Insurance Company v. Ivie*, Utah, 606 P.2d 1197 (1980); *Street v. Farmers Insurance Exchange*, Utah, 609 P.2d 1343 (1980); and *Dupuis v. Nielson*, Utah, 624 P.2d 685 (1981).

benefits by the no-fault insurer but also preserves the right of an injured person to pursue a customary tort claim once certain damage thresholds are met, see §§ 31–41–2 and 31–4–9.

Plaintiffs' first claim in the instant case is for lost wages under the No-Fault Act. In the tort action, plaintiff Carrielee Wilde was awarded $2,000 for lost wages. In that action she was entitled to recover for lost wages both past and future. Although that sum is less than what she claims she was entitled to, the amount recoverable on the tort theory included, although was not necessarily limited to, whatever she was entitled to for lost wages under the No-Fault Act. Therefore, that issue was litigated in the earlier case, and plaintiffs are therefore estopped from relitigating the issue.[2]

■ Plaintiffs also claim recovery for household expenses under the No-Fault Act. Application of the above principles results in a different outcome with respect to this issue. In proving damages in the tort action, the right of plaintiffs to recover for household expenses may not have been litigated in the earlier action. Under the No-Fault Act provisions in force during the one year immediately following Carrielee's accident, disability benefits at the rate of $12 per day were payable "in lieu of reimbursement for expenses which would have been reasonably incurred for services that, but for the injury, the injured person would have performed for his household and *regardless of whether any of these expenses are actually incurred.*" [Section 31–41–6(1)(b)(ii)].[3] [Emphasis added.] Therefore, plaintiffs were entitled to a sum for lost

services for a period of time up to one year during which Carrielee was unable to perform household services due to disability, whether she actually incurred expenses for those services or not.

This benefit was a creature of the No-Fault Act and not dependent in any way on whether expenses for household services were actually incurred as a result of injuries sustained. In the tort action, plaintiffs, to recover damages for household expenses, would have had to prove that they suffered *actual* damages. Under the circumstances of that case, the finding of no damages by the jury may have been based on a failure to prove actual damages. Cf. *Paul v. Kirkendall*, 1 Utah 2d 1, 261 P.2d 670 (1953). Therefore, we cannot hold that the judgment in the tort action necessarily determined the amount, if any, to which plaintiffs are entitled under the No-Fault Act for household expenses.

The benefit provided under the No-Fault Act entitled plaintiffs to recover $12 per day for a maximum of 365 days simply by a showing that Carrielee was disabled so that she could not perform household services which, "but for the injury, [she] would have performed for [her] household." But if the jury in Carrielee's prior action made a determination of the number of days, if any, of Carrielee's disability, that finding is final and binding, and plaintiffs' claim for additional compensation for loss of services would be subject to that finding. If, however, no determination of disability were made in the earlier case, then neither res judicata nor collateral estoppel can prevent

---

2. Had the court in the first case found no negligence, and not ruled on damages, that judgment might not constitute collateral estoppel in a subsequent action against the no-fault carrier.

3. This subsection was amended in 1979 and now provides for:

(ii) a special damages allowance not exceeding $12 per day for services actually rendered or expenses reasonably incurred for services that, but for the injury, the injured person would have performed for his household commencing not later than three days after the date of the injury and continuing for a

maximum of 365 days thereafter, but if the person's inability to perform these services shall so continue for in excess of a total of fourteen days after the date of the injury, this three-day elimination period shall not be applicable.

This amendment became effective May 8, 1979, Laws of Utah, Chapter 119, § 1. Plaintiff Carrielee Wilde was injured on March 24, 1978, and so the 365-day period mentioned in the statute would have ended on March 23, 1979. At that time Carrielee had a fully accrued right to the benefit mandated by the prior law, and her action here should be governed by that law.

plaintiffs from litigating that issue in the instant case.[4] *Searle Bros. v. Searle, supra.* On the record before us, that issue is not clearly resolved. Accordingly, we find no alternative but to remand the case to the trial court to determine that issue and what recovery, if any, plaintiffs are entitled to for household expenses.

■ Finally, we note that the no-fault statutory scheme, § 31–41–8, provides for payment of loss of services by the no-fault insurer on a monthly basis. The initial payment by Mid-Century to Carrielee, and her acceptance thereof, clearly does not terminate the contractual obligation to make additional payments for subsequently accrued claims. In light of the periodic nature of the payment required under § 31–41–8, Mid-Century must have contemplated further payments for loss of services to plaintiffs if required by the terms of the contract.

It is therefore necessary to reverse the summary judgment insofar as it applies to household expenses and to remand for further proceedings.

No costs awarded.

· HOWE and OAKS, JJ., concur.

HENRIOD, Retired Justice (dissenting):

I respectfully dissent and suggest that, contrary to the main opinion's conclusion, *Jones v. Trans-America*[1] should be dispositive of this case.

In *Jones*, the insured was paid by his no-fault insurer $365 in medical expenses and $567 for loss of wages. He was paid *nothing* for "household service." Eighteen months later, long after the 365-day maximum pay period and without theretofore having lodged a claim with his no-fault insurer during such 365-day time frame, as is the case here, he claimed an additional $4,380 for inability to perform "household services" (one of the four main statutory items recoverable under the no-fault act).

In the instant case, Wilde *had* filed a claim and *was* paid $1,296 for 108 days' inability to perform "household services" by Mid-Century. She made no further claim until long after the 365-day period, after which she filed a claim for *all* amounts compensable under the no-fault act, just as *Jones* had done.

After filing such claims with his no-fault insurer, but before the latter recognized or paid them, Jones settled with the tortfeasors for $6,000. He signed a written release "of *any* and *all* claims" he may have had against them for personal injury. It obviously included *personal injury* that would prevent him from doing "housework" —one of the no-fault compensable "threshold" items.

Mrs. Wilde actually settled with *her* no-fault insurer, which included $1,296 for "household services"; then sued Caffey, the tortfeasor, for additional amounts under circumstances identical to those in *Jones* and in *Wilde v. Caffey*, C–78–4523, Third District Court for Salt Lake County.

The main opinion departs from the decision in *Jones* and the judgment in *Wilde v. Caffey, supra*, both having rejected compensability for *any* and *all* claims, including "household services," after the plaintiff insured had "released" *all* claims. It now concludes in this particular case that such "household services" *can be recovered* from the plaintiff's no-fault *insurer*, even after the judgment in *Wilde v. Caffey* (not appealed) had foreclosed *all* claims for personal injury, including "household services."

Two members of this Court (Hall and Stewart) sat on the *Jones* case, and they joined a unanimous Court in denying recovery against the no-fault insurer for "household services."

The facts in the instant case, except for names and number, are identical to those in the *Jones* case. This being so, nothing short of an addendum to the present deci-

---

4. Since the record in the tort action, *Wilde v. Caffey*, is not before us, we do not know if the jury in that case made any determination as to the number of days of Mrs. Wilde's disability.

1. Utah, 592 P.2d 609 (1979).

sion, reversing *Jones v. Trans-America in toto* appears to be mandatory, since that case covers all of the four "threshold" items mentioned. Ironically, the main opinion recognizes no recovery as to three of the items, on the technical grounds of *collateral estoppel*. The *Jones* case barred *all* recovery of *all* the threshold items on statutory grounds, not by way of collateral estoppel or any other defense, which to date has been the law. The instant decision appears to pull the little Dutch boy's thumb out of the dike.

The *Jones* case itself states the purpose of the act and the reasons preventing recovery after settlement with a tortfeasor. It is suggested that such statement should control the instant case. Commenting on the no-fault insurer's defense, it said:

> . . . that by settling with his tortfeasors, plaintiff had chosen his remedy and had cut off defendant's subrogation rights as provided by statute. With these contentions we agree.

The opinion then cited the trial court's decision with approval to the effect that:

> It is the opinion of this Court that the intent of the No-Fault Act was to provide benefits to those sustaining less serious injuries in automobile accidents, but to allow those sustaining more serious injuries the right to proceed against the party at fault without limitation as to amounts recoverable, but *that the person would not be entitled to both recovery under the No-Fault Act and a suit against and recovery from the tortfeasor.*

The emphasized portion above covers precisely the facts of this case and the conclusion was based on a written *release* of *all* claims without reservation of household services, which it also denied. *A fortiori*, the *Jones* decision should apply to the instant case where the trial court, Conder, J., *denied* recovery of *any* threshold claims by a document of even greater dignity—an unappealed judgment of a court of competent jurisdiction,[2] where plaintiff had sued for *all* damages suffered. Such judgment is

now set in cement and should be dispositive, as well as the case in *Jones*, absent reversal, since the plaintiff in *Wilde v. Caffey* filed no timely motion for a new trial, nor a notice of appeal. If she were unhappy with the judgment in that case, her remedy was not a new suit against Mid-Century, but an appeal to this Court on the grounds the jury erred in assessing too little damages.

The issue of "household services" was *fully litigated* in *Wilde v. Caffey*. Any suggestion in the main opinion otherwise simply ignores the fact that the trial court had before it all of the threshold issues, including "household services" for which Mrs. Wilde prayed under the act. The main opinion makes what appears to me to be an unwarranted distinction between "household services" and the other "threshold" items of compensable damages by saying that a no-fault insured is entitled, without proof, to a fixed sum of $12 per day for inability to perform "household services," while in a tort action he would have had to *prove* the amount of damages. It says the distinction arises because the $12 per diem is fixed in the contract,[3] i. e., the contract of insurance with Mid-Century, while *live* testimony must prove the amount in tort against a tortfeasor. The main opinion overlooks the fact that either the $12 arbitrary statutory damages *or* any amount found by proof in a tort action has as its condition precedent and common denominator, *proof of disability*. In *Wilde v. Caffey*, it was known that Mrs. Wilde suffered $1,296 for 108 days of disability *when she was released by her doctor*, but she presented no proof of disability *thereafter*. The jury was entitled to find that was the only disability she had, and that $1,296 was all she was entitled to, and so found as a fact by not awarding her any additional amount, the 365-day limit having long since passed before she filed her suit asking for more household service compensation.

The distinction appears to be illusory, since the legislature in fixing the amount of

---

2. Wilde v. Caffey, C–78–4523, Third District Court for Salt Lake County.

3. It was the *legislature*, not the *contract*, that fixed the price.

damages is only a substitute witness for the doctors and employment agents. In the one case, the damages are fixed by legislative fiat and in the other by live witnesses. Any difference that might result is only one in amount, and has nothing to do with the basic entitlement or compensability aspect of the no-fault act (Sec. 31–41–6). The same argument could have been made in the main opinion as to *all* of the threshold items, since each has its statutory mathematical exactitude, i. e., $150 per week for 52 weeks *for loss of wages, and $2,000 for medical.* The deciding factor is not "amount" but "disability" and the jury, by awarding her nothing more, obviously found she was not disabled after the 108 days when she was released by her own doctor as one able to go back to work.

The test for recovery is not what one *might* recover against a third party, but what he can recover against a no-fault insurer, under the no-fault act. *Jones v. Trans-America* says once one has chosen his weapon in a tort skirmish, he cannot draw blood anew in a contest with his no-fault insurer, and it made no reservation whatever in the case of "household services," nor does it imply such exception. Nor does the no-fault act itself make or imply such exception.

The jury in *Wilde v. Caffey*, by awarding *no* specific amount for damages resulting from inability to perform "household services," hardly could have found other than as a matter of fact that Mrs. Wilde was *not* disabled to do "housework," which is another way of saying she was able to do so and hence was not entitled to any further compensation. The main opinion seems to say that the "household services" matter was not before the jury, but it appears that it was. The plaintiff sued for *all* damages, including those for "household services," and the jury had *all* the items before it, including "household services."

Mrs. Wilde should be denied this specific item of threshold damage which the decision here excepts for special treatment and procedure if for no other reason than the very basis it justifies rejection of "loss of wages" damage in *Wilde v. Caffey*—by collateral estoppel—adjudged by unappealed judgment in that case. The opinion says "household services" damage was not settled by collateral estoppel or otherwise because of a rule of evidence relating to "proof" that may result in an amount different from the $12 amount fixed by the legislature without proof in no-fault cases. Irrespective of any such distinction, *Jones v. Trans-America* resolved this case when it said that "settling with his tortfeasors," plaintiff had chosen his remedy and cut off defendant's subrogation rights as provided by statute. It is significant that Jones had been paid nothing for "household services" by his no-fault insurer, but made claims for the maximum benefit *after* he signed the release. The no-fault act itself reflects the conclusion arrived at in *Jones*, where the letter and spirit of the no-fault act are pointed out, as follows:

> On appeal, the parties chose not to squarely address the basis of the trial court's decision but focus instead on peripherally related matters. Basically the court's ruling is correct. The whole tenor of the Act is that an injured person will not be permitted to recover from an insurance carrier (over and above what the carrier has previously paid in benefits) once he has successfully recovered from his tortfeasor for personal injuries. Any other interpretation would be to permit double damage recovery.

and also, that:

> Double recovery for a single item of loss was never contemplated by the legislature and we will not permit any type of automatic reward or "windfall" to an injured plaintiff.

The act itself militates against the notion first advanced in the opinion here and *not* in appellant's brief—that one item of damage, "loss of household services," has one procedure and deserves more consideration and wider scope of review than the other three main items. This notion is new and was not urged by appellant, but who now knows from this decision how to proceed on remand. The act does not authorize the

making of "household services" as item for special litigation, not subject to the defense of "collateral attack," after judgment based on an "all loss" complaint simply because the legislature fixed damages therefor at $12 per day to run for 365 days. It does not reserve to the claimant a second lawsuit against the no-fault insurer that would invade its spirit calling for inexpensive, speedy settlements. The act's purpose clearly is stated in its second Section:

> The intention of the legislature is hereby to possibly stabilize, if not effectuate certain savings in, the rising costs of automobile accident insurance and to effectuate a more efficient, equitable method of handling the greater bulk of personal injury claims that arise out of automobile accidents, these being *those not involving great amounts of damages.*

The main opinion's statement that "Plaintiffs seek in this suit to recover full benefits for . . . household services" is completely accurate, but appears to assume entitlement to recover against a no-fault insurer is vested in Mrs. Wilde regardless of her settlement with the tortfeasor. It overlooks entirely the fact the no-fault act it relies upon specifically reserves a right of subrogation to the no-fault insurer, a right she has destroyed by settlement of *all* claims, which were litigated and satisfied.[4] Any effort on the part of the injured releasor, Mrs. Wilde, thereafter to recover from the no-fault insurer would be a payment that the latter thereafter could not recover from the tortfeasor's carrier that was released by the judgment, resulting in payment to the insured an uncontemplated, or in truth, a double payment upon which not only equity but the act itself frowns.

The main opinion's contention is that subrogation is not an issue here because the

judgment in *Wilde v. Caffey*, unappealed, barred it by collateral estoppel, and hence "we are left this issue: Are plaintiffs entitled to recover *additional* no-fault insurance benefits *after having obtained a judgment against the tortfeasor?*"

It is conceded that the issue accurately has been stated. It must also be conceded that Mid-Century had a right of subrogation since the main opinion said it had been eliminated by collateral estoppel. Having conceded the accuracy of the issue, the only remaining issue is whether a *release* of the tortfeasor of *all* claims is dispositive in barring recovery from the no-fault insurer, if written on a common ordinary piece of paper, as was clearly answered affirmatively in *Jones*, but is *not* dispositive where all claims against the tortfeasor have been resolved and *satisfied* by a *judgment* of a court of competent jurisdiction. If the judgment has the same dignity as a "release," the *Jones* case is dispositive here. If it does *not* have the same or greater dignity, this Court has no course to pursue, but to reverse *Jones v. Trans-America* in its entirety.

Instead of the low expense cost settlement visioned in the act and expressed in the *Jones* case, involving a simple full release, it is believed that the present case should and could have been handled under the act, to encourage the same kind of inexpensive settlement of the claim involved here without resort to litigation. Nonetheless, Mrs. Wilde chose further to litigate. It involved a two-year procedure, lawyer's fees on both sides, 100 pages of pleading, a number of court appearances with different judges, attendance and pay of court attaches, the employment of a jury, post-judgment procedure, and appeal here,

---

4. The main opinion refers to *Allstate v. Ivie*, Utah, 606 P.2d 1197 (1980) in discounting Mid-Century's right of subrogation. That case involved the no-fault insurer's suit against an insured, unlike that here, where Mrs. Wilde is suing the no-fault insurer, Mid-Century, for benefits under the act that already have been settled by a judgment for *all* damages, general, special, no-fault and otherwise, which destroyed a subrogation right. *Allstate v. Ivie*

concedes the right, by saying only that it must be asserted in an arbitration suit between the insurance companies. Its language: "However, *Allstate is not precluded from claiming reimbursement from Travelers in an arbitration proceeding.*" The case provided two strong dissents. Its ruling is suspect and if any case should be reversed it should be *Allstate*, not *Jones*, which was a unanimous decision.

preparation of a record, filing it, preparing briefs, and arguing the case before the Justices, who now reverse such process for another go at the same thing—with a good chance of another two-year delay, a second appeal and double expense.

Concededly, public policy justifies compensation for injuries suffered at the hand of the tortious conduct of another, insurance or not, but it strains credulity to believe that the legislature, clearly expressing a stated purpose inexpensively to compensate for comparatively small injuries only, intended a daily double, providing compensation twice, or maybe thrice, for the same identical injury. Such a conclusion, which appears to be unwarranted under the act, suggests inequity and unfairness. It would seem to create a new kind of white collar offense not yet codified.

The trial court should be affirmed, with no exceptions. However, the majority, disagreeing, should reverse itself on *Jones v. Trans-America.* Sending it back for further proceedings not only may result in double recovery for appellant, incident to a second trial, but in an unrealistic expense, anathema to the spirit and letter of the no-fault act, as pointed out above—all of which encourage more litigation and expense to be absorbed ultimately by way of increased premiums for no-fault insurance, to protect persons, such as is the case here, who pay no premiums, have no insurance of their own and obtain redress from two policies owned by others, in which the beneficiaries are not identified by name, but by accident with dual connotation.

HALL, C. J., concurs.

MAUGHAN, J., did not participate herein; HENRIOD, Retired Justice, sat.